**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | No. 2:17-cr-00556-DCN |
| vs. | ) | |
| | ) | **ORDER** |
| CHRISTOPHER AUSTIN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on a motion to suppress and a motion to dismiss count 2 of the indictment filed by defendant Christopher Austin ("Austin"). For the reasons set forth below, the court grants in part and denies in part the motion to suppress, and denies the motion to dismiss.

## I. BACKGROUND

On the morning of September 8, 2016, Austin was in a truck parked in a field in Dorchester County, South Carolina. South Carolina Department of Natural Resources ("DNR") Officer Adam Bedard ("Bedard") was on patrol when he saw a truck parked in the middle of a peanut field at 1:15 PM. In his experience as a DNR officer, Bedard frequently utilized the "open fields" doctrine to check on trucks parked in open fields to determine if hunters had hunting permits. In Bedard's experience, people would park their truck in an open field and then go back into the forest to continue hunting.

Bedard approached the truck, and when he was approximately ten feet behind the tailpipe of the truck could see a rifle pointing out of the driver's side window almost parallel to the ground. Bedard approached the vehicle and observed Austin in the driver's seat looking at pornography on a tablet and masturbating. Bedard asked Austin what he was doing, to which Austin replied "hunting." Bedard then asked to see Austin's

1

hunting license, to which Austin replied that he did not have a hunting license. Bedard then asked Austin for his driver's license and registration, to which Austin replied that he had neither a license nor registration. While Bedard was asking Austin these questions, Bedard observed a shotgun on the passenger seat, and walked over to clear the loaded shotgun of ammunition. Bedard then asked Austin for his full name and date of birth to run through the system, at which point he also asked Austin to step out of his car. Austin gave a false name to Bedard. Bedard again asked Austin to get out of the truck as he ran the truck's license plate. Bedard ran the license plate to determine whether the truck was stolen, and the radio transmission in his car asked Bedard to call headquarters in Columbia. Upon hearing this, Austin began to run away into a nearby peanut field.

Bedard pursued Austin and handcuffed him. After handcuffing him, Bedard walked Austin back to his truck and asked him a series of questions, including asking Austin why he ran, to which Austin responded "I've got warrants out for arrests" and "I have meth on me." Austin also periodically said "I can't breathe, I can't breathe." Bedard then asked Austin if he had used meth that day, to which Austin said "yes." Bedard then asked a follow-up question of how long before the encounter Austin had used meth, and Austin replied "10 minutes."

Bedard called Emergency Medical Services ("EMS") because Austin was short of breath. After EMS arrived, the EMS workers and Bedard searched Austin. On Austin's person, Bedard found four needles, $151.74 in currency, and two baggies with 2.3 grams and 0.48 grams of meth respectively. Austin was then taken to the hospital by EMS. Bedard ran Austin's real name through the system and received information about all of the pending warrants for Austin's arrest. After running the license plates on Austin's

truck, Bedard saw that the plates were registered to the original owner of the truck. Bedard called the Dorchester County Sheriff's Department, and shortly thereafter a Dorchester County deputy arrived on the scene and informed Bedard that the truck was stolen and that he had contacted the truck's owner who was coming to get the truck. The truck's owner arrived on the scene and told Bedard that the truck had been stolen for "a long time," and that none of the items in the truck were his and stated "You can do what you want to do" with the items in the truck.

When a vehicle is identified as stolen or the owner informs officers that the vehicle is stolen, DNR practice is to inventory the truck and then return the items as personal property after the interaction. It was only after the owner gave consent to search the truck that Bedard opened the doors of the truck, at which point he began to inventory the truck and began to take pictures of the items in the truck. In the truck, Bedard observed: assorted tools; one Tom-Tom nagivation device; two iPads; many different speakers, amps, and subwoofers; and a laptop bag in the back passenger seat containing lighter fluid, instant cold packs, coffee filters, rock salt, CVS pseudoephedrine blister packs, lithium batteries, rubbing alcohol, a bottle of muriatic acid, as well as hypodermic needles and digital scales as well as 18.75 grams of ephedrine. Bedard also seized a Remington .308 rifle on the passenger seat of the truck, a Remington 12 gauge shotgun on the passenger seat of the truck, and a High Standard .22 LR pistol under the seat on the driver's side floor. All of the firearms were loaded. Bedard also found bags of ammunition including ammunition for the pistol in the truck. Bedard called the Dorchester County Narcotics Department to inform the department that the laptop contained meth paraphernalia, and a narcotics officer took the laptop bag and the meth

found in Austin's pockets. After Bedard inventoried all of the items in the truck, he returned the items to Austin's mother, who confirmed that the items were Austin's personal items and signed off on the items. The truck's actual owner then took possession of the truck and drove it home.

Austin was charged with one count of possessing pseudoephedrine with intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1). In count two, Austin is charged with using and carrying a firearm during and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). In count three, Austin was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) for possessing a Remington .308 caliber rifle and ammunition, a Remington 12 gauge shotgun and ammunition, and a High Standard .22 caliber pistol and ammunition.

On March 20, 2018, Austin filed this motion to suppress. The government responded on April 5, 2018. On March 19, 2018, Austin filed a motion to dismiss. The court held a hearing on June 12, 2018, and instructed the government to file a response to Austin's motion to dismiss. The government complied on June 22, 2018. The motions have been fully briefed and are now ripe for the court's review.

## II.  DISCUSSION

The questions before the court are discrete: (1) should certain statements made by Austin be suppressed because they violate the rights established by Miranda v. Arizona, 384 U.S. 436, (1966); (2) should the warrantless search of the truck by upheld; and (3) should count two of the indictment, which charges Austin with use of a firearm in commission of drug trafficking, be dismissed? The court addresses each in turn.

### A.  Motion to Suppress

Austin asks the court to suppress the drugs, guns, and ammunition found in the search of the truck after his arrest. He also asks the court to suppress certain statements that he made directly before and after his arrest. The court finds that Austin has no standing to challenge the physical evidence that was found when Bedard conducted a search of the stolen truck, but grants the motion as it relates to statements Austin made after being handcuffed by Bedard.

1. **Warrantless Search of Truck**

Austin contends that the officers violated his Fourth Amendment rights when they searched his car without a warrant. What Austin does not mention is that he was in a stolen truck at the time of the search. As the Supreme Court recently reiterated in <u>Byrd v. United States</u>, 138 S. Ct. 1518, 1529 (2018), "a person present in a stolen automobile at the time of the search may [not] object to the lawfulness of the search of the automobile," and "[n]o matter the degree of possession and control, the car thief would not have a reasonable expectation of privacy in a stolen car." <u>Id.</u> at 1529 (internal citations and quotations omitted). Since Austin was in a stolen truck, he does not have standing to object to the search of the truck. The court cannot even reach the merits of Austin's argument.

In his reply, Austin argues that while the truck may have been stolen, he did not know it was stolen when he purchased it. But if Austin relies on a lack of knowledge of the stolen nature of the truck to establish a reasonable expectation of privacy in it, he bears the burden of proof of those facts. He failed to meet that burden.

In <u>United States v. Cates</u>, 641 F. Supp. 2d 613, 615 (N.D. Tex. 2009), the court confronted a similar factual scenario. The court there held that an individual acquiring a

stolen vehicle innocently from an "unscrupulous" car dealer would present a legitimate question about the expectation of privacy in an "unwittingly stolen" vehicle. Id. But to present the possibility of standing, the defendant must present "proof of such a purchase." Id.

Similarly, here Austin must prove that he did not know the truck was stolen or that he believed he was in rightful possession of the truck. Austin did nothing of the sort. Instead, during the hearing, Austin questioned Bedard at length about when Bedard learned that the truck was stolen. But it is not to Bedard's state of mind that this court looks but to Austin's own reasonable expectation of privacy—the law requires that the court determine whether the defendant at the time of the search had a reasonable expectation of privacy that society is prepared to recognize as legitimate.

It is only after Austin has met this burden of proving that he innocently possessed a stolen vehicle that the court can consider under what circumstances an individual who innocently possesses a stolen vehicle can have a legitimate expectation of privacy in that vehicle. Austin presented no evidence or testimony or even argument about the circumstances under which he acquired the truck. The court heard only testimony that the truck had been stolen "for a long time" and that the truck had been stolen from a construction site.[1] Therefore, the court cannot reach the issue of whether an innocent purchaser of a stolen truck is entitled to Fourth Amendment standing.

---

[1] Furthermore, it is unlikely that Austin purchased the truck unknowingly—the owner said that the truck had been stolen "for a long time" and the license plates on the truck were still the same as when the owner had the truck. If Austin had purchased the truck legally, he would have switched out the license plates with his own within a short period of time of acquiring the vehicle.

6

In sum, to establish standing for a Fourth Amendment claim Austin must prove by a preponderance of the evidence that he had a legitimate expectation of privacy in the stolen truck. After considering Austin's arguments, testimony, and evidence associated with the purchase of the truck, the court finds that the evidence does not support an inference that Austin believed he had a lawful and legitimate possessory interest in the vehicle when it was searched. Therefore, his motion to suppress as to the physical evidence found in the truck is denied.

### 2. Statements

Next, Austin argues that any statements he made after he was detained were in violation of his Miranda rights.

It is the government's burden to prove, by a preponderance of the evidence, that a defendant was properly advised of his Miranda rights; that the defendant voluntarily, knowingly, and intelligently waived said rights; and that the ensuing statement was voluntarily made. United States v. Durham, 741 F.Supp. 498, 504 (D.Del. 1990) (citing Colorado v. Connelly, 479 U.S. 157, 169 (1986)). Two factors must be considered to determine whether a waiver was voluntary, knowing and intelligent:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

Moran v. Burbine, 475 U.S. 412, 421 (1986). The totality of the circumstances surrounding the questioning must be examined to determine the sufficiency of Miranda warnings and any waiver of rights. See North Carolina v. Butler, 441 U.S. 369, (1979).

After Bedard handcuffed Austin in the peanut field, he was "in custody" for Miranda purposes. During the hearing, Bedard testified that he never read Austin a Miranda warning, and that any Miranda warning that Austin received would have been at the hospital. The government's argument rests on the exceptions to Miranda—namely, that even if Austin were in custody, Bedard's questioning was not interrogation because it was conversational and, alternatively, that Bedard's questioning fell under the "public safety" exception to Miranda. As a threshold matter, Austin's statements can be separated into two categories: (1) statements made during the initial investigatory stop, when Bedard noticed Austin's truck parked in the middle of a field and a rifle pointing out of the truck; and (2) statements made after Austin was handcuffed while Bedard was leading him away from the peanut field and back to the truck. The analysis is separate for each category.

For the first category, Austin was not "in custody" such that he was afforded Miranda protections. A suspect is considered to be "in custody" "either upon formal arrest or under any other circumstances where the suspect is deprived of his freedom of action in any significant way." Berkemer v. McCarty, 468 U.S. 420, 429 (1984). If there has been no formal arrest, a suspect is "in custody" where a reasonable person in the suspect's position would have believed that his freedom of action had been curtailed to a "'degree associated with formal arrest.'" Id. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Questioning during an investigatory stop such as a traffic stop is not considered to be "in custody" for Miranda purposes. See Maryland v. Shatzer, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or Terry stop . . . does not constitute Miranda custody."). Here,

Bedard stopped Austin to inquire about whether he had a hunting license, and ordered him out of the vehicle to run a computer check on his driver's license and hunting license. Such a stop is analogous to a Terry stop where no Miranda warning is required. Therefore, none of Austin's statements in the first category are suppressed.

The second category is a more nuanced inquiry. The government contends that the questioning in this category was not interrogation but conversational and that even if the court finds that it was interrogation the questioning was done for officer safety. The court is not convinced, and suppresses Austin's statements after he was arrested as violating the protections that Miranda affords.

As to the government's first argument that the questioning was "conversational," the law is clear that interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect. See Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Bedard's direct questions to Austin of "why did you run" and "do you have drugs on you" fit the definition of interrogation. In United States v. Reyes, 225 F.3d 71, 76 (1st Cir. 2000), the First Circuit held that Miranda applies "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate." Certainly, a question such as "do you have drugs on you" even when couched as background information is a question that will elicit incriminating information.

The court is similarly unconvinced by the government's second argument that the questioning was for officer safety. The public safety exception is a narrow exception to Miranda, and the seminal case delineating the exception is New York v. Quarles, 467 U.S. 649 (1984). In Quarles, the Supreme Court reasoned that where the police had

9

reason to believe the suspect had just removed the gun from his holster and discarded it in the supermarket, "[s]o long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it." Id. at 657. In such circumstances, "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. The test under Quarles—whether police questioning is necessary to protect the public or police from an immediate danger—is straightforward, but requires an examination of the "totality of the circumstances." See United States v. Reyes, 353 F.3d 148, 152 (2d Cir.2003) (citing United States v. Banks, 540 U.S. 31, 42 (2003)).

      The public safety exception is a narrow one. Cases where courts have applied the exception demonstrate just how narrow it is. In United States v. Brown, 449 F.3d 154, 159 (D.C.Cir. 2006), abrogated in part on other grounds by Dean v. United States, 556 U.S. 568 (2009) the court found that the public safety exception applied when police officers apprehended a suspect moments after he had robbed a bank at gunpoint and then asked him the location of the gun before giving him Miranda warnings. In United States v. Jones, 567 F.3d 712 (D.C. Cir. 2009), officers approached a suspect who had committed first-degree murder with a handgun who had previous convictions for gun and drug offenses. When the officers arrived at the area, which was "characterized as 'an open-air drug market' and 'a very dangerous part of the city'" that was "filled with people," the defendant saw them and fled on foot. Id. One officer heard a gunshot while in pursuit of the defendant, and then saw the defendant enter the stairwell of an apartment

10

building from which two small children emerged.  Id.  The officer then entered the semi-lit stairwell, where he found the defendant wearing a bulky jacket and tackled him.  Id.  Within thirty seconds of apprehending him—and before handcuffing him or conducting a full pat-down search—the officer asked the defendant, who was wearing a bulky jacket, whether he had "anything on" him.  Id.  He replied, "I have a burner in my waistband," and a second officer then retrieved a firearm from the defendant's waistband.  Id. at 714.

Courts have also found that risk of potentially harmful drug paraphernalia such as exposed hypodermic needles is sufficient to trigger the officer safety concern.  In United States v. Carrillo, 16 F.3d 1046, 1049 (9th Cir. 1994), as amended (May 17, 1994), the Ninth Circuit held that asking a suspect whether he "had any drugs or needles on his person" was within the public safety exception because "the danger of transmission of disease or contact with harmful substances is real and serious enough; a pressing need for haste is not essential."  Similarly, in United States v. McDaniel, 182 F.3d 923 (7th Cir. 1999) the Seventh Circuit held that "The need to determine whether McDaniel was armed or carrying potentially harmful drug paraphernalia falls squarely within the Quarles exception."  The government contends that Bedard "could have been stuck by a needle if he frisked defendant" and so the questions about whether Austin had drugs on him were prompted by concerns for officer safety.  But during the hearing it became very clear that Bedard's worry was not about needles poking him.  If it were, then this may fall in line with the similar, albeit somewhat dated, cases of Carillo and McDaniel.  But the rationale that Bedard gave during his testimony was that his questions about drug use were provoked by a concern for Austin's health, because Austin was "fading in and out" and Austin stated multiple times "I can't breathe, I can't breathe."

Ultimately, after considering the totality of the circumstances here—namely, that Austin was handcuffed and being led through a peanut field—the court finds that it was objectively unreasonable for Bedard to have thought that asking Austin whether and where he had drugs was necessary to protect himself or the public from immediate danger. His questioning does not fall within the "public safety" exception to Miranda. By the time Bedard asked the questions, Austin was handcuffed so there was no ongoing threat to the safety of officers or other persons that could have "reasonably prompted" the question. See United States v. Mobley, 40 F.3d 688, 693 (4th Cir. 1994) (public safety exception did not apply where "[defendant] was encountered naked; by the time he was arrested, the FBI already had made a security sweep of his premises, and they had found that he was the sole individual present, and that the apartment was a residence for Mobley alone"; and then FBI agent asked him if there were any weapons present as he was "being led away"). Furthermore, Austin was not running into a stairwell in a "high crime" area where two small children had just left like the defendant in Jones but was being led handcuffed by an officer through a peanut field in rural Dorchester County. The government made no argument that there were many people in the peanut field around Austin or the truck such that Bedard was concerned that those people would have access to the drugs. And Bedard's own testimony refuted the government's argument that he was motivated to ask about drugs on Austin's person because of a fear of being harmed by exposed hypodermic needles.

The court finds that this second category of statements that Austin made—specifically, statements in response to questions by Bedard after being handcuffed—were statements that were interrogative, not "conversational" and that they do not fall under

the public safety exception of Miranda. The statements were made in contravention of the protections afforded by Miranda and are suppressed.[2]

### B. Motion to Dismiss a Count of the Indictment

Austin next argues is that there is insufficient evidence to justify a charge for use of a firearm in furtherance of a drug trafficking offense and that count 2 of the indictment for the use of a firearm in furtherance of a drug trafficking offense in violation of 18 U.S.C. § 924(c) should be dismissed. The court assumes that this motion is made pursuant to Rule 12(b)(3) of the Federal Rules of Criminal Procedure, which sets forth certain defects in the indictment that can be brought before the court on a pretrial motion. Certainly, Austin cites no other authority. The court denies this motion.

Generally, "if an indictment sets forth the essential elements of the offense in sufficient detail so as fairly to inform the defendant of the nature of the charge, then it is immune from attack on a motion to dismiss." United States v. Brandon, 150 F.Supp.2d 883, 884 (E.D. Va. 2001) (citing Hamling v. United States, 418 U.S. 87, 117 (1974)). What Austin is arguing about is that there is insufficient evidence to support a conviction under § 924(c). Specifically, he argues that there is insufficient evidence from which the fact finder could conclude that he possessed the shotgun "in furtherance of" his drug trafficking activity. But a motion to dismiss a count of the indictment cannot dispute

---

[2] Of course, even if the statements that Austin made violate the prophylactic protections of Miranda, the physical evidence seized from the truck as a result of Austin's statements would not be suppressed. As explained above, Austin was in a stolen truck and thus has no standing to claim a privacy interest in items found in a stolen truck. And in any event, the Miranda violation would also not require suppression of the items found on Austin's person. In United States v. Patane, 542 U.S. 630 (2004), the Court held that a lack of a Miranda warning does not justify the suppression of the physical evidence derived from a voluntary "un-warned" statement. Austin made no argument that any of his statements were not voluntary.

whether there is sufficient evidence to support the indictment. It is only certain "defenses, objections, and requests" that can be raised by a motion and that motion determined without a trial "on the merits." Rule 12(b)(3) of the Federal Rules of Criminal Procedure authorizes a defendant to bring a motion alleging that a defect in the indictment exists based on a number of limited grounds:

> (B) a defect in the indictment or information, including:
>
> > (i) joining two or more offenses in the same count (duplicity);
> > (ii) charging the same offense in more than one count (multiplicity);
> > (iii) lack of specificity;
> > (iv) improper joinder; and
> > (v) failure to state an offense;

Id. Austin does not argue that the indictment is deficient in that it fails to plead all of the essential elements of the § 924(c) offense, or that count two is duplicitous. Indeed, his motion challenging the indictment is based on none of the grounds set forth in rule 12(b)(3).

Instead, Austin asks the court to step into the shoes of the fact-finder and determine the merits of the case. He contends that that there is insufficient evidence from which a fact-finder could conclude that he possessed a firearm "in furtherance of" his drug trafficking activity. He argues that Bedard searched him and found only four needles, $151.74 in cash, and two baggies with 2.3 grams and 0.48 grams of methamphetamine. According to Austin, this drug paraphernalia in conjunction with the shotgun that Bedard observed does not warrant a § 924(c) charge.

It is a touchstone for any inquiry into the legality of indictments that courts may not "look behind" grand jury indictments if "returned by a legally constituted and unbiased grand jury . . . ." Costello v. United States, 350 U.S. 359, 363 (1956). The

Costello court specifically declined to hold that defendants may "challenge indictments on the ground that they are not supported by adequate or competent evidence." Id. at 364. The Fourth Circuit put it clearly in United States v. Mills, 995 F.2d 480, 487 (4th Cir. 1993) when it said that "courts lack authority to review either the competency or sufficiency of evidence which forms the basis of an indictment and may not quash indictments when the errors which produce them, such as prosecutorial misconduct or violation of a statute, do not affect substantial rights."

Austin may move to dismiss count 2 based on insufficient evidence during trial by asking for a directed verdict. But to allow him to do so now would result in a preliminary trial on the merits "to determine the competency and adequacy of the evidence before the grand jury." Costello, 350 U.S. at 363. Austin has presented no argument that the indictment in this case was not returned by a legally constituted and unbiased grand jury and is not valid on its face. Therefore, his motion to dismiss count two of the indictment based on a claim of insufficient evidence is denied.

## IV.  CONCLUSION

For the reasons set forth above, the court **GRANTS IN PART AND DENIES IN PART** the motion to suppress, **DENYING** as to the physical evidence found in the search of the truck and the statements that Austin made during the initial investigatory stop but **GRANTING** as to the statements that Austin made after his arrest. Furthermore, the court **DENIES** the motion to dismiss count two of the indictment.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**June 22, 2018**
**Charleston, South Carolina**